# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 16
Curby Toussaint,
  Respondent,
   v.
Port Authority of New York and
New Jersey,
  Appellant,
et al.,
  Defendants.

Christian H. Gannon, for appellant.
Brian J. Shoot, for respondent.

GARCIA, J:

  We are once again called upon to determine whether a provision of the Industrial

Code, in this case 12 NYCRR 23-9.9 (a), sets forth a concrete specification sufficient to

- 1 -

give rise to a non-delegable duty under Labor Law § 241 (6) (*see Ross v Curtis-Palmer Hydro-Elec. Co.*, 81 NY2d 494, 501-505 [1993]).  We hold that it does not and therefore reverse.

Plaintiff Curby Toussaint, an employee of Skanska USA Civil Northeast, Inc., was struck by a power buggy while operating a rebar-bending machine at the World Trade Center Transportation Hub construction site owned by the Port Authority of New York and New Jersey (the Port Authority).  All power buggies—small, self-powered vehicles operated by one person and used to move materials on construction sites (*see* Industrial Code [12 NYCRR] § 23-1.4 [b] [40])—were owned and operated by contractors or subcontractors.  On the day of the accident, a trained and properly designated operator drove the buggy into the area near plaintiff's workstation.  That operator got off the vehicle and a short time later another worker, who was not designated or trained to do so, got on and drove the buggy a short way before losing control, crashing into plaintiff, and injuring him.

Plaintiff commenced this action against the Port Authority asserting claims under Labor Law § 200 (1) and Labor Law § 241 (6).[1]  Supreme Court, New York County granted defendant summary judgment on the Labor Law § 200 (1) claim, holding that the Port Authority "merely provid[ed] general oversight of the construction project" and had no supervisory authority over the way the work was performed.  However, the Court denied the Port Authority summary judgment on the Labor Law § 241 (6) claim, concluding that

_____

[1] Defendant Granite Construction Northeast, Inc. was granted summary judgment on all claims; that ruling is not at issue on this appeal.

Industrial Code § 23-9.9 (a), which provides that "[n]o person other than a trained and competent operator designated by the employer shall operate a power buggy," was sufficiently specific to support that claim.

The Appellate Division, with two Justices dissenting, modified Supreme Court's order by granting plaintiff summary judgment on the Labor Law § 241 (6) claim (174 AD3d 42 [1st Dept 2019]). While both the majority and the dissent agreed that the regulation's instruction that a "trained and competent operator" must operate the buggy "lack[ed] a specific requirement or standard of conduct," the majority concluded that the phrase "designated person" was a "proper predicate for a claim under Labor Law § 241 (6)" (*id*. at 45). The dissent would have held that the Industrial Code provision was "insufficiently specific," noting that the majority was relying on a term—"designated"— that the Court had already "found to lack specificity" in prior cases and was "ignoring the remainder of the regulatory language" (*id*. at 47 [Tom, J., dissenting]). The Appellate Division granted the Port Authority leave to appeal to this Court, certifying the following question: "Was the order of this Court, which modified[] the order of the Supreme Court[] to grant plaintiff summary judgment as to liability on the Labor Law § 241 (6) claim[,] insofar as it is predicated on 12 NYCRR 23-9.9 (a)[,] as against defendant Port Authority of New York and New Jersey, properly made?" We now answer that question in the negative.

Labor Law § 241 (6) imposes a non-delegable duty on owners and contractors to " 'provide reasonable and adequate protection and safety' for workers and to comply with the specific safety rules and regulations promulgated by the Commissioner of the

Department of Labor" (*Ross*, 81 NY2d at 501-502, quoting Labor Law § 241 [6]). The statute is a "hybrid," with the first sentence "merely reiterat[ing] the common law-standards of care" and accordingly providing no independent source for an owner's or general contractor's non-delegable duty (*Morris v Pavarini Constr.*, 9 NY3d 47, 50 [2007]). It is the second sentence, mandating compliance with the rules of the Commissioner, that creates a nondelegable duty—but only with respect to certain regulations (*id.*).[2]

In *Ross*, this Court "refined the standard of liability under section 241 (6) by requiring that the rule or regulation alleged to have been breached be a 'specific, positive command' " (*Rizzuto v L.A. Wenger Contr. Co.*, 91 NY2d 343, 349 [1998], quoting *Ross*, 81 NY2d at 504). In *Ross*, a case involving claims under three separate provisions of the Labor Law—sections 200 (1), 240 (1) and 241 (6)—we took the opportunity to set out our "understanding of Labor Law § 241's over-all design, as well as its relationship with other protective provisions of the Labor Law" (*Ross*, 81 NY2d at 502-503). Labor Law § 200 (1), we pointed out, codifies the common law duty to maintain a safe workplace, but to recover under this provision, a plaintiff must show that an owner or general contractor exercised some supervisory control over the operation (*id*. at 505; *see Comes v New York State Elec. & Gas Corp.*, 82 NY2d 876, 877 [1993]). By contrast, the duty to comply with the Commissioner's regulations imposed by Labor Law § 241 (6) is nondelegable and there

---

[2] Breach of a duty imposed by a regulation promulgated under Labor Law § 241 (6) is merely some evidence of negligence, and contributory and comparative negligence are valid defenses to such claims (*Ross*, 81 NY2d at 502 n 4).

is no need to show that an owner exercised supervision or control over the worksite to establish a claim (*Ross*, 81 NY2d at 502).

We explained in *Ross* that permitting plaintiffs to circumvent the requirement in section 200 (1) that the defendant have control over the work by using a "broad, nonspecific regulatory standard as predicate for an action against a nonsupervising owner or general contractor under Labor Law § 241 (6) would seriously distort the scheme of liability for unsafe working conditions" (*id.* at 504). Such a result, we concluded, "could not have been within the Legislature's intention and was certainly not contemplated by our Court when we held that an owner or general contractor could be held liable for violations of rules promulgated pursuant to Labor Law § 241 (6) without regard to Labor Law § 200 (1)'s requirement of supervision or control over the work" (*id.* at 504-05, citing *Allen v Cloutier Constr. Corp.*, 44 NY2d 290 [1978]). More was needed. Accordingly, we held that only "provisions of the Industrial Code mandating compliance with concrete specifications" give rise to a non-delegable duty under Labor Law § 241 (6) (*id.* at 505).

In the nearly thirty years since this Court decided *Ross*, we have repeatedly reaffirmed the rule that to state a claim under section 241 (6), plaintiff must allege that defendant violated an Industrial Code regulation "that sets forth a specific standard of conduct and [is] not simply a recitation of common-law safety principles" (*St. Louis v Town of N. Elba*, 16 NY3d 411, 414 [2011]; *see Gasques v State of New York*, 15 NY3d 869, 870

[2010]; *Misicki v Caradonna*, 12 NY3d 511, 515 [2009]; *Morris*, 9 NY3d at 50; *Rizzuto*, 91 NY2d at 349; *Comes*, 82 NY2d at 878).  We do so again today.[3]

The regulation relied on by plaintiff provides that "[n]o person other than a trained and competent operator designated by the employer shall operate a power buggy" (12 NYCRR 23-9.9 [a]).  In assessing whether that regulation is specific enough to support a Labor Law § 241 (6) claim, we examine the text without reference to the underlying facts (*see Misicki*, 12 NY3d at 521 n 2).  With respect to 12 NYCRR 23-9.9 (a), we agree with the majority and dissent below that the "trained and competent operator" requirement "is general, as it lacks a specific requirement or standard of conduct" (174 AD3d at 45; *see id.* at 47 [Tom, J., dissenting]).  We disagree, however, with the Appellate Division majority's conclusion that the additional direction that "trained and competent" individuals must also be "designated" somehow transforms the provision from a general standard of conduct to a "specific, positive command" (*Ross*, 81 NY2d at 504; *Berg v Albany Ladder Co., Inc.*, 40 AD3d 1282, 1285 [3d Dept 2007] [holding that the Industrial Code provision mandating that "power-operated equipment . . . shall be operated only by trained, designated persons and all such equipment shall be operated in a safe manner at all times" was "no more than

---

[3] The dissent argues that our *Ross* decision was "error," that we have somehow corrected ("*sub silentio*") that holding by repeatedly applying it, and that we now finish the job by overruling it (dissenting op at 21-22).  Each step of that progression is flawed.  Judges may, as we do today, disagree over whether a particular rule is sufficiently concrete to give rise to liability under Labor Law § 241 (6), but adopting the dissent's approach would give rise to the very harm this Court identified and sought to prevent in *Ross*—a concern as relevant today as it was then.  Our holding here should dispel any notion that *Ross* has somehow been "eroded."

a restatement of common-law requirements and is insufficient to establish a nondelegable duty under Labor Law § 241 (6)"], *affd* 10 NY3d 902 [2008]; *Guallpa v Canarsie Plaza, LLC*, 144 AD3d 1088, 1091 [2d Dept 2016] [same]; *Scott v Westmore Fuel Co.*, 96 AD3d 520, 521 [1st Dept 2012] [same]).  Because the regulation does not mandate compliance with concrete specifications, plaintiff's section 241 (6) claim must be dismissed.

The order of the Appellate Division should be reversed, with costs, the motion by defendant Port Authority of New York and New Jersey for summary judgment dismissing the Labor Law § 241 (6) claim predicated on Industrial Code (12 NYCRR) § 23-9.9 (a) granted, and the certified question answered in the negative.

WILSON, J. (dissenting):

More than 10,000 people worked to build the World Trade Center complex; a tiny handful destroyed it. Immediately thereafter, President George W. Bush declared: "As a symbol of America's resolve, my administration will work with Congress, and [the Governor and Mayor of New York] to show the world that we will rebuild New York

City."[1]  The new World Trade Center complex, including the 1776-foot Freedom Tower, was not built by politicians.  Like its predecessor, it was built by thousands of construction workers; among them, Mr. Curby Toussaint.

I

At the time of his accident, Mr. Toussaint, a 34-year-old father of four, had worked at the World Trade Center site as a union lather for almost 13 years.  Mr. Toussaint prepared the steel used to construct foundations and walls: lifting steel bars, placing them in the rebar machine, bending them to specification, and then stacking, tying and tagging them. After working at the World Trade Center from 7 AM to 2 PM, Mr. Toussaint regularly worked a second shift from 3 PM to 11 PM at other construction sites, a role that included carrying and installing reinforcing bars that could run up to 40 feet in length.

On October 24, 2014, Mr. Toussaint was standing at the rebar machine, bending steel rods for use in wall construction.  Somewhere behind him, Paul Estavio, a laborer, was moving a "power buggy"—a specialized vehicle used to move loads of concrete and other heavy payloads around construction sites.  Mr. Estavio stopped the buggy, got out, and began laughing and joking with James Melvin, an operating engineer responsible for oiling cranes.  Whether Mr. Estavio gave Mr. Melvin the keys or Mr. Melvin took control

---

[1] *Address to a Joint Session of Congress and the American People*, The White House (Sept 20, 2001), available at https://georgewbush-whitehouse.archives.gov/news/releases/2001/09/20010920-8.html.

of the buggy without his permission is in dispute, but what happened next is not.  Mr. Melvin—who was neither trained nor designated to operate power buggies—crashed.  The out-of-control 1000-pound machine careened into Mr. Toussaint, striking him in the back and crushing him against the rebar machine.

The crash severely injured Mr. Toussaint.  He underwent two back surgeries, first an anterior and posterior lumbar fusion and later an implantation of a spinal cord stimulator for pain relief.  Despite those surgeries, he suffers from chronic pain, nerve damage, and insomnia.  His insurance does not cover the total cost of his medical expenses.  Although he is only 40 years old, he is totally disabled.  He cannot play basketball with his son or go dancing with his wife.  The man who once carried steel bars on his shoulders now walks with a cane.

II

New York's Labor Law has, for more than a century, provided special measures of protection for construction workers (*see Stewart v Ferguson*, 164 NY 553, 554 [1900]; *Quigley v Thatcher*, 207 NY 66, 68 [1912]; *Koenig v Patrick Constr. Corp.*, 298 NY 313, 318-319 [1948]).  For certain types of construction site accidents, liability is placed directly on the owners and general contractors regardless of their control of the working conditions (commonly termed "vicarious liability"), and for some types of construction-site accidents the defendants may be held entirely liable even if the worker is to some degree at fault (commonly termed "strict liability").  Labor Law § 241 is one such provision.  It holds

owners and contractors vicariously liable for all injuries to workers "when constructing or demolishing buildings or doing any excavating in connection therewith." It consists of several subsections. The first five also impose strict liability because they contain legislatively determined standards with which owners and contractors must comply (*e.g.*, "if the floors or filling in between the floors are of fireproof material, the flooring or filling in shall be completed as the building progresses" [*id.* § 241 (1)]).

Subsection (6), which is at issue here, imposes vicarious but not strict liability. Unlike subsections (1) through (5), it does not contain a standard of conduct directly set forth by the Legislature. Instead, subsection (6) provides that owners and contractors must comply with rules promulgated by the Commissioner of Labor that "provide reasonable and adequate protection and safety to the persons employed therein or lawfully frequenting such places." Those rules are commonly referred to as the Industrial Code, codified at 12 NYCRR 23. We have emphasized that "[t]he legislative intent of section 241 (6) is to ensure the safety of workers at construction sites" (*Morris v Pavarini Constr.*, 22 NY3d 668, 673 [2014]).

III

Mr. Toussaint's claim arises under Labor Law § 241 (6) and rests on a rule promulgated by the Commissioner, 12 NYCRR 23-9.9 (a). That rule requires that "[n]o person other than a trained and competent operator designated by the employer shall operate a power buggy." Under the standard established in *Ross v Curtis-Palmer Hydro-*

*Electric Company*, a regulation promulgated pursuant to Labor Law § 241 (6) imposes vicarious liability on owners and contractors only if it states a "specific, positive command," rather than "general safety standards" that merely reiterate the common law duty of care to provide a safe workplace (81 NY2d 494, 503, 505 [1993]).

The majority holds that the Commissioner's rule stated in section 23-9.9 (a) is not specific. I disagree for two reasons: first, the rule facially states specific requirements beyond what the common law duty of care requires. Second, the majority's conclusion is irreconcilable with our prior caselaw.

Turning first to the language of the regulation, it is quite specific: it restricts the (a) operation of (b) power buggies to (c) only trained and competent persons who (d) additionally are designated by the employer. One might justifiably conclude that the common law would require operation by competent persons, but 12 NYCRR 23-9.9 (a)'s additional requirements are distinct from what the common law requires: (1) persons operating a power buggy must be "trained," not just "competent," and (2) persons operating a power buggy must be "designated" to do so. "Trained" adds an element beyond competence: section 23-9.9 (a) requires that the operator must have been trained in power buggy operation, not just have figured it out and become competent without any training. The "designated" requirement likewise adds a safety requirement absent in the common law by preventing even trained and competent operators from operating power buggies unless they have been designated to do so by their employer.[2] The designation requirement

---

[2] "Trained," "competent" and "designated" are not synonymous, but are understood to have specialized meanings with regard to occupational safety standards (*see, e.g.*, U.S.

has the potential to increase safety in at least two ways: concentrating the work among a reduced set of persons who have it as their specialized job improves performance and safety, and requiring employers to go through a designation process compels them to consider whether the designated persons are the best suited to the job. The common law contains no such designation requirement. In short, 12 NYCRR 23-9.9 (a) requires that a specific vehicle be operated by a specific set of people with specific preparation, and as such states a "specific, positive command" giving rise to vicarious liability under Labor Law § 241 (6) (*Ross*, 81 NY2d at 505).

Second, the majority's decision does not comport with our existing caselaw, particularly our decisions in *Rizzuto v LA Wenger Contracting Company* (91 NY2d 343 [1998]) and *Misicki v Caradonna* (12 NY3d 511 [2009]). Comparison of the regulations at issue in those cases to section 23-9.9 (a) demonstrates that, if anything, the regulation at issue here is *more specific* than the regulations in those cases, which we held were sufficiently specific to support a Labor Law § 241 (6) claim.

---

Department of Labor Occupational Safety and Health Administration, "Training Requirements in OSHA Standards and Training Guidelines" OSHA 2254 1998 (Revised) [distinguishing among OSHA guidelines requiring that certain employees be "trained" from those requiring that certain employees be "certified," "competent," or "qualified," from those requiring that certain employees be "designated"]; *compare, e.g.*, CFR 1926.302 [e] [1] ["Only employees who have been trained in the operation of the particular tool in use shall be allowed to operate a power-actuated tool"], *with* CFR 1926.900 [a] ["The employer shall permit only authorized and qualified persons to handle and use explosives"], *with* CFR 1926.800 [j] [1] [i] [A] ["The employer shall assign a competent person who shall perform all air monitoring required by this section"]).

In *Rizzuto*, we reasoned that 12 NYCRR 23-1.7 (d) "unequivocally directs employers not to 'suffer or permit any employee' to use a slippery floor or walkway, and also imposes an affirmative duty on employers to provide safe footing by requiring that any 'foreign substance which may cause slippery footing shall be removed . . . to provide safe footing'" (91 NY2d at 350-351 [alteration in original] [emphasis omitted]). We concluded that those requirements mandated "a distinct standard of conduct, rather than a general reiteration of common-law principles," and as such was sufficiently specific to support a claim under Labor Law § 241 (6) (*id*. at 351).

Frankly, it is hard to see how that regulation differs from the common law standard. The failure to address a slippery floor at a construction site is fully encompassed by ordinary rules of negligence, which impose a duty to take reasonable steps to remediate slippery floors of all kinds (*see, e.g.*, *Toms v Post & McCord*, 219 NY 612 [1916] [duty of employer to keep work platform free of ice]; *O'Leary v Standard Oil Co.*, 265 NY 627 [1934] [duty of office building to ensure men's room floor is not slippery]; *Johnsen v Staten Island Hosp., Inc.*, 265 NY 658 [1934] [duty of hospital to ensure its floors are not slippery]; *Kenny v Essman*, 299 NY 583 [1949] [duty of meat market to ensure its floor is not slippery]; *Cook v Rezende*, 32 NY2d 596 [1973] [duty of apartment building to ensure steps are not slippery]; *Lempert v Steinberg & Pokoik Mgmt. Corp.*, 7 NY3d 917 [2006] [duty of office building to ensure lobby floor is not slippery]; *Parietti v Wal-Mart Stores, Inc.*, 29 NY3d 1136 [2017] [duty of store to ensure its floors are not slippery]). There is a reason why the phrase "slip-and-fall" is often equated with negligence actions; there is no

reason the floors of construction sites would be exempt from common law rules imposing a duty to take reasonable steps to avoid slippery floors.

In any event, section 23-9.9 (a) imposes an affirmative duty on employers to use only trained and competent persons to operate power buggies and to designate specific persons to do so. If the instant regulation required only that "competent" persons operate power buggies, it would be on all fours with *Rizzuto*, which requires that floors not be slippery. But section 23-9.9 is more specific than the regulation in *Rizzuto* because it further requires training and designation. To make *Rizzuto*'s regulation equivalent, we would need to add text requiring that only trained and designated persons remediate slippery floors.

The majority's conclusion that section 23-9.9(a) is not specific also conflicts with our decision in *Misicki*. The regulation in question in *Misicki*, 12 NYCRR 23-9.2 (a), provides:

> "All power-operated equipment shall be maintained in good repair and in proper operating condition at all times. Sufficient inspections of adequate frequency shall be made of such equipment to insure such maintenance. Upon discovery, any structural defect or unsafe condition in such equipment shall be corrected by necessary repairs or replacement."

We held that the first two sentences, standing alone, did not state a standard of conduct distinct from the common law, but that the third sentence constituted "a distinct standard of conduct" and so gave rise to a cause of action (12 NY3d at 521). Yet the third sentence is merely the flip side of the coin expressed by the first two sentences: there is no way to

make sure equipment is "in proper operating condition at all times" without "repairing or replacing" it if defective or unsafe.

An analogous regulation as to power buggies might require that power buggies must be operated safely and only persons competent to operate them may do so. But the power buggy regulation requires much more than the regulation we found specific in *Misicki*: only trained and designated persons may operate power buggies. If, as *Misicki* holds, "the third sentence of section 23-9.2 (a) 'mandates a distinct standard of conduct, rather than a general reiteration of common-law principles'" (*id.*, quoting *Rizzuto*, 91 NY2d at 351), the same must be true of section 23-9.9 (a) *a fortiori*.[3]

In sum, whether one looks at the language of the regulation itself, or our prior decisions, or both, the majority's holding is insupportable. To deny Mr. Toussaint recovery, we are flouting both the Commissioner's directive and our own precedents.


IV


There is a more fundamental reason that Mr. Toussaint should be able to pursue his claim under Labor Law § 241 (6), one rooted deep in the history and purpose of the Labor

---

[3] *Misicki* held that the third sentence itself was sufficiently specific to support at claim under Labor Law § 241(6). The opinion did cursorily reference the subsequent sentences of the regulation, noting that they "describe requirements for servicing and repairing the equipment" (12 NY3d at 521). Those sentences, which say, "[t]he servicing and repair of such equipment shall be performed by or under the supervision of designated persons. Any servicing or repairing of such equipment shall be performed only while such equipment is at rest" (12 NYCRR 23-9.1 [a]), are similar in specificity to the power buggy regulation: both require the designation of persons, and the *Misicki* regulation requires that machines be at rest whereas the power buggy regulation requires that operators be trained.

Law.  The Legislature directed two marked deviations from the common law—vicarious and strict liability—to protect construction workers in specified circumstances as a way of making those ultimately responsible for construction projects ultimately responsible for injuries resulting from those projects.  The Legislature has used those tools of enhanced liability selectively and not always jointly.  Our Court's holding in *Ross v Curtis-Palmer Hydro-Electric Company* (81 NY2d 494 [1993]) eroded the Legislature's selection of the rules of Liability under Labor Law § 241 (6), as I discuss in *infra* section IV.C.  But we somewhat ameliorated that misstep in our subsequent decisional law, including in *Rizzuto,* and *Misicki*.  The majority now takes a backward step that is inconsistent with the Legislature's carefully built structure.  Mr. Toussaint and workers like him are exactly the class of persons contemplated by the statute: Labor Law § 241 is explicitly designed to provide extra protections from hazards inherent in construction sites.

A

The original statute, predecessor to Labor Law § 241, was passed at the height of the Industrial Revolution, when the rapid increase in injuries and deaths in workplaces led to widespread recognition of the pressing need to prevent industrial accidents.  From 1850 to 1880, the number of workers between the ages of 10 to 50 killed by accidents increased by 70 percent nationally (John Fabian Witt, The Accidental Republic: Crippled Workingmen, Destitute Widows, and the Remaking of American Law 26 [2004]).  By 1912, workplace accidents killed an estimated 82,500 per year (*id*. at 26-27).  Although miners and railroad workers faced the highest risks of injury, construction was also a deadly

trade.  Newspapers during the period are replete with graphic reports of workers falling to their deaths from rickety scaffolds (*see*, *e.g.*, *Weak Scaffold Kills Two*, NY Times, Sept 13, 1896, at 11).  Between 1890 and 1913, the New York World Building, the Manhattan Life Insurance Building, the Park Row Building (also known as 15 Park Row), the Singer Tower, the Metropolitan Life Tower, and the Woolworth Building each replaced its predecessor as the world's tallest building.  Meanwhile, at the Wainwright Commission's hearings on the prevention of workplace accidents in 1911, New York City unions reported more than 200 accidents on construction sites in the previous year, including at least 17 deaths (1911 Rep to Leg of the State of NY by the Comm Appointed Under Chapter 518 of the Laws of 1909 to Inquire into the Question of Employer's Liability and Other Matters: Second Report, Causes of Industrial Accidents at 93, 122).

Injured workers had little recourse.  In the nineteenth century, the fellow servant doctrine regularly prevented workers from recovering from their employers when injured on the job (*see* John Fabian Witt, *The Transformation of Work and the Law of Workplace Accidents, 1842-1910*, 107 Yale L J 1467, 1469-1470 [1998]).  Widely adopted by American courts following *Farwell v Boston & Worcester Rail Road* (45 Mass 49 [1842]), the doctrine rests on the proposition that workers assume the risk of injury at work, including the risk of injury as the result of the negligence of a fellow employee (*id*. at 59; *see also Cullen v Norton*, 126 NY 1, 6 [1891]; *Quigley v Levering*, 167 NY 58, 63-64 [1901]).  But as industrialization accelerated, social reformers and organized labor joined forces to advocate for workplace safety and employer liability laws (*see generally* R. Rudy Higgens-Evenson, *From Industrial Police to Workmen's Compensation: Public Policy and*

*Industrial Accidents in New York, 1880-1910*, 39 Labor History 365 [1998]; Robert Asher,

*Failure and Fulfillment: Agitation for Employers' Liability Legislation and the Origins of*

*Workmen's Compensation in New York State, 1876-1910*, 24 Labor History 198 [1983]).

Sections 240 and 241 were enacted in that first flush of progressive lawmaking. The

first statute to address safety on construction sites made the failure to provide suitable

scaffolds, hoists, stays, or ladders a misdemeanor (L 1885, ch 314). In 1896, a second

statute was enacted to require all contractors and owners to complete the flooring or

underflooring as the building progressed, requirements virtually identical to

section 241 (1)-(3) (L 1896, ch 936). In 1897, those two laws were incorporated into the

Labor Law as sections 18 and 20 (L 1897, ch 415). Over the next 40 years, the statutes

were gradually expanded to increase protection and ensure enforcement. The statutes were

revised to require enclosures of shafts and planking over any openings (L 1899, ch 192; L

1935, ch 440);[4] to protect workers engaged in demolition and excavation (L 1930, ch 603;

L 1932, ch 470); and, in 1932, to empower the industrial board to promulgate regulations,

a role filled today by the Commissioner of Labor (L 1932, ch 470; Labor Law § 241 [6]).

Initially, although New York courts recognized that the statutes created causes of

action for injured workers, they were reluctant to hold that violations of the statute

constituted negligence as a matter of law and continued to apply the fellow servant doctrine

(*see Rooney v Brogan Constr. Co.*, 107 App Div 258, 262 [2d Dept 1905]; *Kiernan v*

---

[4] Some of those legislative enactments were designed to counteract limitations imposed by courts. For example, prior to the 1935 amendment, New York courts repeatedly held that the requirement that floors be planked over did not apply to shafts or other openings (*e.g., Ithaca Trust Co. v Driscoll*, 169 App Div 377, 381 [3d Dept 1915]).

*Eidlitz*, 109 App Div 726, 728 [1st Dept 1905]; *Rooney v Brogan Constr. Co.*, 147 App Div 68, 71-72 [2d Dept 1911]).  Our jurisprudence began to shift, however, as we recognized that the Labor Law, which was enacted "for the protection of workmen from injury . . . is to be construed as liberally as may be for the accomplishment of the purpose for which it was framed" (*Quigley*, 207 NY at 68 [holding that a contractor could become liable to a subcontractor and his employees for the safety of a scaffold under Labor Law §18, now Labor Law § 240]).  In 1912, we rejected an assumption-of-risk defense when a plaintiff was injured as a result of the employer's failure to comply with an analogous provision of the Labor Law (*see Fitzgerald v Warren*, 206 NY 355, 358 [1912] ["Where an employer deliberately fails to comply with the statute the courts should be loath, except in a very clear case, to hold that the employee assumes the risk of his master's violation of the law"]).  Not long after, in *Amberg v Kinley*, we held that when a provision of the Labor Law created a cause of action, it was "not necessary for the plaintiff to prove negligence on the part of the defendant, because the failure to observe the statute creates a liability *per se*" (214 NY 531, 535 [1915]).

By mid-century, it was settled law that both Labor Law § 240 and the first five sections of Labor Law § 241 impose absolute liability on employers and owners (*Koenig*, 298 NY at 318; *Joyce v Rumsey Realty Corp.*, 17 NY2d 118, 122 [1966]; *see also Zimmer v Chemung County Performing Arts*, 65 NY2d 513, 522 [1985]).  However, we consistently distinguished violations of standards set forth in administrative regulations from violations of standards set forth directly by the Legislature in statutes.  In *Conte v Large Scale Development Corporation*, we held that the State Board of Standards and Appeals's

regulations "did not establish negligence *per se* but was simply some evidence of negligence which the jury could take into consideration with all the other evidence bearing on the subject" (10 NY2d 20, 29 [1961], quoting *Schumer v Caplin*, 241 NY 346, 351 [1925]).  The source of that rule was the well established proposition that whereas a violation of a statute may "of itself establish negligence," a rule or ordinance does not have the same force (*Schumer*, 241 NY at 351; *see also Fluker v Ziegele Brewing Co.*, 201 NY 40, 44 [1911]; *Knupfle v Knickerbocker Ice Co.*, 84 NY 488, 491 [1881]).  That proposition—distinguishing between rules established directly by the Legislature and regulations promulgated by the executive branch—is a rule of general application, not a rule specific to the Labor Law.[5]  Prior to *Ross*, the specificity of the regulation was immaterial to the analysis.  If a regulation or rule applied to the facts of the case, the regulation or rule could be presented to the jury as some evidence of negligence to be taken "into consideration with all the other evidence bearing on that subject" (*Conte*, 10 NY2d at 29).

B

In 1962, the Legislature revised Labor Law § 241, removing all the subsections so that it had a single provision authorizing the Commissioner to promulgate rules (*Allen v Cloutier Constr. Corp.*, 44 NY2d 290, 298-299 [1978]).  Thus, section 241 then contained

---

[5] As we explained in *Schumer*, the distinction between statutory commands, the violation of which can establish negligence per se, and regulations, the violation of which may be introduced merely as evidence of negligence, is rooted in separation of powers doctrine (241 NY at 351).

no legislatively directed safety standards.  The Legislature also amended the law to make

subcontractors—in addition to owners and contractors—liable for violations (L 1962, ch

450, § 3).  Because

> "the amended statute was devoid of any specific directions
> normally contained in statutes imposing absolute liability . . . a
> violation of the rules promulgated thereunder resulting in the
> injury of a member of the protected class was properly held to
> be merely some evidence of negligence on the part of some
> person. . . .  The liability of an owner or general contractor
> under the 1962 amendment was, therefore, dependent upon a
> showing that they exercised some degree of control or
> supervision over the work site"

(*Allen*, 44 NY2d at 299; *see also Kappel v Fisher Bros.*, *6th Ave. Corp.* 39 NY2d 1039,

1041 [1976]).

That legislative experiment was brief.  Just seven years later, the Legislature

reversed course and readopted the statute substantially in the form it had been before 1962,

including deleting the reference to subcontractors (L 1969, ch 1108, § 3).  The AFL-CIO,

which sponsored the bill, argued that "variances and violations occur with greater

frequency from code rules than from the statute, and that as a result needless injuries and

deaths have occurred" (Mem of AFL-CIO, Bill Jacket, L 1969, ch 1108 at 20).

Furthermore, the inclusion of subcontractors led to "attempted shifting of responsibility

and liability between general contractor and subcontractor" (*id*).  "This, bill, therefore,

returns the safety responsibility to where it belongs—owners and contractors" (*id*).  The

New York State Department of Labor adopted the union's reasoning in its memorandum

in support of the bill, also noting that the changes "would strengthen an employee's remedy

in a third party action" (Industrial Commissioner Mem in Support, Bill Jacket, L 1969, ch

1108 at 4).  As we explained in *Allen v Cloutier Construction Corporation*, the 1969 Amendments to Labor Law § 241 "restore[d] to section 241 the vitality and protections which had previously existed and which had been removed from the statute by virtue of its 1962 amendment" (44 NY2d at 300).

Unsurprisingly, when the Legislature reestablished section 241 in its pre-1962 form, we interpreted it the way we had in the past.  In *Allen*, we held that the 1969 amendments imposed "absolute liability upon an owner or contractor for a breach of the duties imposed by subdivisions 1 through 6 of section 241 irrespective of their control or supervision of the construction site" (*id.*).  In subsequent cases, we concluded that a violation of the regulations propagated by the Commissioner was simply "some evidence of negligence" (*Long v Forest-Fehlhaber*, 55 NY2d 154, 159 [1982]; *Zimmer*, 65 NY2d at 522).  Those decisions reflect the longstanding rule of general application in negligence actions, differentiating between the effect of violations of legislatively established standards from those set out in regulations or ordinances.

C

The holding in *Ross v Curtis-Palmer Hydro-Electric Company* (81 NY2d 494 [1983]) appeared quite out of thin air, tethered to no statutory text and engrafting a novel requirement on top of 70 years of established precedent governing Labor Law § 241 (6).  *Ross* held that the provisions of the Industrial Code "mandating compliance with concrete specifications" give rise to a nondelegable duty, whereas "those that establish general safety standards," incorporating the general common law standard for duty of care, do not

(*id.* at 505).  Because nonspecific regulations do not differ from the common law standard, we further held that workers injured by breaches of "nonspecific" regulations could not state any claim at all under section 241 (6) (*id*. at 504-505).  No such requirement had ever existed previously, and *Ross* altered a statutory remedy without any legislative hint undergirding that change.

Instead, *Ross* explained the source of its rule by pointing to dicta in *Bland v Manocherian* (66 NY2d 452, 460 [1985]) distinguishing between the specificity of different statutory provisions: section 200 (1), which "merely incorporates the general common-law standard," and sections 240 (1) and 241, which "contain[] specific commands and standards" (*Ross*, 81 NY2d at 503).  Then, *Ross* explained that our cases distinguished between statutory requirements that are "self-executing" in that they may be implemented "'without regard to external considerations such as rules and regulations, contracts or custom and usage'" and those "whose terms 'require reference to outside sources to determine the standards by which a defendant's conduct must be measured'" (*id*., quoting *Zimmer*, 65 NY2d at 523).

*Ross*'s analysis pertains to whether the Legislature has set out a rule different from the common law standard: if it has, strict liability attaches to it; if not, ordinary rules of negligence apply.  That analysis does not bear on the force of regulations, to which strict liability never attached.  *Ross* did not purport to alter the longstanding rule that violations of regulations may be introduced as proof of negligence whereas violations of legislative standards constitute negligence per se.  To the contrary, *Ross* approvingly cited a passage in *Zimmer* that differentiates between the first five subdivisions of Labor Law § 241 and

subdivision six, because of the "long-established principle that a rule of an administrative agency or an ordinance of local government is merely some evidence to be considered on the question of a defendant's negligence and lacks the force and effect of a substantive legislative enactment" (*Zimmer*, 65 NY2d at 522).

The *Ross* "specificity" standard has no basis in precedent or statute and runs counter to the Legislature's overriding policy to provide robust protections for construction workers. Before the 1962 amendment, and for the decade after the restoration of Labor Law § 241 in its pre-1962 form, construction workers injured by conduct that violated *any* regulation issued by the Commissioner had a cause of action under section 241(6); after *Ross*, they had a cause of action only if the regulation was specific enough to impose a duty distinct from the common law. Granted, violation of a regulation that said nothing more than what the common law requires would not add anything meaningful to the evidence at trial, but *Ross*, by eliminating the cause of action, eliminated vicarious liability even under an ordinary negligence standard, despite the fact that Labor Law § 241 commands that the liability imposed as to all subsections thereunder extends to "[a]ll contractors and owners and their agents." Put simply, if Mr. Toussaint had been injured before 1962, or after 1969 and before *Ross*, he would have been able to pursue a claim against the owner and general contractor and hold them vicariously, though not strictly, liable, referring to the regulation as evidence of negligence. Because *Ross* invented a "specificity" requirement, and because the majority concludes the power buggy regulation is not sufficiently different from the common law standard, Mr. Toussaint cannot proceed.

The total loss of Mr. Toussaint's section 241(6) claim is not what the Legislature ever envisioned. In 1969, the Legislature reenacted the statute almost exactly as it had previously existed, reaffirming owners' and general contractors' nondelegable duty to provide a safe workplace. If the Legislature had intended that these parties could not be held liable for violations of regulations that merely restated the common law, it could have done so. In fact, the legislative history suggests the opposite: the Legislature sought to strengthen injured workers' right to recover and restore the law to its original form.

D

The standard imposed by *Ross* has proven to be utterly unworkable. We could readily start with the present case, *Misicki* and *Rizzuto*. How does one explain to a construction worker, general contractor, owner or insurer why a subcontractor's failure to repair or replace defective tools or clean up a slippery floor are requirements beyond the common law that therefore will render the owner and general contractor liable, but operation of a power buggy by an unauthorized or untrained person is prohibited by the common law, and therefore will not render them liable?

Our incomprehensible *Ross* rule has tormented the lower courts and litigants too. Take, for example, *Scott v Westmore Fuel Company* (96 AD3d 520 [1st Dept 2012])—a case principally relied on by the dissenting Appellate Division Justices in this case. In *Scott*, the First Department simultaneously held that a regulation was sufficiently distinct from the common law because it provided that "[e]xcavating machines shall be operated only by designated persons" and "[n]o person except the operating crew shall be permitted

on an excavating machine while it is in motion or operation" (12 NYCRR 23-95), while another regulation was not, even though it provided that "[a]ll power-operated equipment used in construction, demolition or excavation operations shall be operated only by trained, designated persons and all such equipment shall be operated in a safe manner at all times" (12 NYCRR 23-9.2 [b] [1]) (*Scott*, 96 AD3d at 520-521). Does the common law prohibit one of these but not the other?

Or compare section 23-5.1(h) ("Every scaffold shall be erected and removed under the supervision of a designated person"), with section 23-7.1(c) ("Only trained, designated persons shall operate personnel hoists and such hoists shall be operated in a safe manner at all times"). The Appellate Division has held that the former is specific (*Batista v Manhattanville Coll.*, 138 AD3d 572, 572-573 [1st Dept 2016]), while the latter is not (*Wade v Bovis Lend Lease LMB, Inc.*, 102 AD3d 476, 477 [1st Dept 2013]; *Robles v Taconic Mgt. Co., LLC*, 173 AD3d 1089, 1091-1092 [2d Dept 2019]). The only difference between the two provisions is the placement of the word "designated." Moreover, query why a worker injured by an excavating machine operated by an unauthorized person may recover, but no cause of action arises when the machine in question is a personnel hoist.

E

Until today's decision, the trend of all the courts, including ours, was to hold regulations sufficiently specific and distinct from the common law even when they were hardly, if at all, different from the common-law standard. As Judge Graffeo observed in dissent in *Misicki*, "there is no distinction between the requirement that forms be kept

structurally safe . . . and that structural defects/unsafe conditions be remedied" (12 NY3d at 523).[6] Likewise, in *Rizzuto* a unanimous Court held: "requiring that any 'foreign substance which may cause slippery footing *shall be removed . . . to provide safe footing*' . . . mandates a distinct standard of conduct, rather than a general reiteration of common-law principles, and is precisely the type of 'concrete specification' that *Ross* requires" (91 NY2d at 351, first quoting 12 NYCRR 23-1.7 [d], then quoting *Ross*, 81 NY2d at 503-505). One would surely think, however, that common law negligence would be established by failing to remove slippery substances on floors—as is unwaveringly established in centuries of common law jurisprudence. The *Rizzuto* Court offered no explanation for its bare say-so.

The decisions of our court and the lower courts after *Ross,* holding regulations sufficiently specifically distinct from the common law when the conclusion is a head-scratcher, suffer from a failure of logic (identified by Judges Graffeo and Smith) but have, effectively, moved to correct *Ross*'s error *sub silentio*. Recall, for a moment, that before *Ross*, when a regulation was breached, a construction worker would be able to pursue a claim under section 241 (6) to hold owners and general contractors vicariously liable,

---

[6] *See also St. Louis v Town of North Elba* (16 NY3d 411, 417-418 [2011]) (Smith, J., dissenting) ("deciding whether the requirements of a particular regulation are 'specific' or 'concrete' enough can be tricky. . . . Now the majority holds that we may disregard the words . . . . [T]his kind of 'purpose-based' interpretation . . . makes no sense at all in the context of a statute whose whole point, as we have interpreted it, is to give a remedy only for violations of a regulation's specific commands. If courts can freely rewrite the regulations to give whatever protection a court thinks should be given, why not forget about the general-specific distinction explained in *Ross* and allow plaintiffs to sue owners and contractors under Labor Law § 241 [6] for any violation of the common-law standard of care?").

though not strictly liable. As we noted in *Rizzuto*, "[a]n owner or general contractor may, of course, raise any valid defense to the imposition of vicarious liability under section 241 (6), including contributory and comparative negligence" (91 NY2d at 350). After *Ross*, as we and other courts have deemed regulations that require the repair or replacement of broken tools, the use of trained or designated workers, or the maintenance of slip-free flooring to set out a standard beyond what the common law requires, we have engaged in a fiction. The common law of negligence would deem those patently reasonable precautions. The effect of that fiction is to undo much of *Ross*.[7] Each time we, or the lower courts, have deemed one such pablum regulation sufficient to support a Labor Law § 241 (6) claim, we have, morsel by morsel, walked away from *Ross*, slowly returning toward the Legislature's intended structure. Today, we reverse course for no reason, throwing the lower courts into even more confusion as to how to make sense of *Ross*'s unintelligible standard, which itself contravenes the legislative plan.

Had we properly interpreted the regulatory language here, or had we followed our own precedent, or had we recognized the error of *Ross* and the tacit way in which the courts have partially made up for that error, we would have held that the rule stated in section 23-9.9 (a) is sufficiently distinct from the common law, thus providing Mr. Toussaint with a cause of action under Labor Law § 241 (6) to hold the defendants vicariously liable for his

---

[7] *St. Louis* eroded *Ross* in a different way than *Rizzuto* did. In *St. Louis*, we held that a regulation specifically regulating "power shovels and backhoes" should additionally apply to other equipment "that is enlisted to do the material handling that is otherwise performed by power shovels and backhoes" because "[t]he Industrial Code should be sensibly interpreted and applied to effectuate its purpose of protecting construction laborers against hazards in the workplace" (16 NY3d at 415-416).

injuries. Doing so would not mean that a plaintiff in Mr. Toussaint's position would automatically win, because the regulation is not a statute. It would mean that he could offer the regulation as evidence of a standard of conduct and that the defendants could interpose certain defenses. That is the protection the Legislature gave Mr. Toussaint and all similarly situated construction workers. Instead, in a terse opinion, we make a U-turn and head toward the worker protections offered by Khufu, Khafre and Menkaure. After losing his health and his livelihood, Mr. Toussaint loses his case as well.

Order reversed, with costs, motion by defendant Port Authority of New York and New Jersey for summary judgment dismissing the Labor Law § 241 (6) claim predicated on Industrial Code (12 NYCRR) § 23-9.9 (a) granted and certified question answered in the negative. Opinion by Judge Garcia. Chief Judge DiFiore and Judges Singas and Cannataro concur. Judge Wilson dissents in an opinion, in which Judges Rivera and Troutman concur.

Decided March 22, 2022